**In re Daniel DAMRON, Jr., Frances Dee Damron, Debtors.**

**Bankruptcy No. 2–80–02810.**

United States Bankruptcy Court,
S. D. Ohio, E. D.

Nov. 20, 1980.

Arthur G. Wesner, Columbus, Ohio, for K-Beck Furniture Mart.

Samuel L. Calig, Columbus, Ohio, for debtors.

Frank Pees, trustee.

## ORDER ON DETERMINATION OF SECURED STATUS

R. J. SIDMAN, Bankruptcy Judge.

This matter is before the Court under the provisions of § 506(a) of the Bankruptcy Code with respect to the extent to which the claim of K–Beck Furniture Mart, Inc. shall be allowed as a secured claim in this Chapter 13 proceeding. This determination is linked to the objection to confirmation filed by K–Beck to the Chapter 13 plan jointly proposed by these debtors, which objection will be ruled upon by the Court in a separate order.

The Court makes the following findings of fact. On December 15, 1979 the debtors purchased various items of furniture and appliances at K–Beck Furniture Mart, a retail store. The cash price of these items totaled $4,800.00. In connection with this purchase the debtors executed a promissory note calling for payment of forty-eight (48) monthly installments of $163.08 each for a total pay-back of $7,827.84. The debtors additionally granted a security interest in the merchandise purchased in order to secure the indebtedness evidenced by the promissory note signed by them. To the extent the evidence before the Court reveals the nature of the merchandise purchased and the purchase price of the separate items, they are as follows:

| Item | Price |
| --- | --- |
| Philco Color Console Television | $1,000.00 |
| Morris Electrophonic Console Stereo | $1,000.00 |
| Whirlpool Microwave Oven | 798.00 |
| Schweiger Sofa | $750.00–$800.00 |
| Kingsley Chair | $200.00 |
| Moutclair Chair | $125.00 |
| Bunk Bed Outfit and Wardrobe | unspecified |

The debtors have retained and used this merchandise in their home since December of 1979 and have testified that the condition of the merchandise is "like new". The debtors had listed the collective value of the merchandise in § 13b of their Chapter 13 statement as being $600.00.

At the hearing on confirmation K-Beck appeared and objected to confirmation of the Chapter 13 plan on various grounds, including the proposed valuation of its collateral as disclosed in the debtors' Chapter 13 statement. The Court thus took evidence with respect to the valuation question at the time of the confirmation hearing in order to make a determination as to the appropriate treatment of the K–Beck claim as a secured claim.

K–Beck offered the testimony of its corporate officer and co-owner Nathan Katz. Based upon his experience of twenty years in the furniture business, he offered the opinion that the merchandise, based upon the assumption of a "like new" condition (he had not seen the merchandise since it left his store), has a present fair market value of $3,000.00, broken down as follows:

| Item | Present Fair Market Value |
| --- | --- |
| Philco Color Console Television | $800.00 |
| Morris Electrophonic Console Stereo | $800.00 |
| Whirlpool Microwave Oven | $600.00 |
| Schweiger Sofa | $400.00 |
| Kingsley Chair | $125.00 |
| Moutclair Chair | $125.00 |
| Bunk Bed Outfit and Wardrobe | $150.00 |

The basis of this opinion included consideration of the fact that K–Beck's mark-up policy with respect to furniture is 100% (for example, a furniture item which the manufacturer sells to K--Beck for $500.00 will be

sold by K–Beck for $1000.00) and with respect to appliances is 70% (for example, an appliance purchased by K–Beck for $500.00 will be sold by K–Beck at $850.00). The values testified to by Katz represented the retail price he felt he could charge for those goods in his store in their present used condition. K–Beck, however, is not a dealer in used furniture. The debtors offered no other evidence with respect to valuation except for the valuation originally indicated on their Chapter 13 statement.

The provisions of § 506(a) of the Bankruptcy Code indicate that the value of a creditor's interest in the debtors' property must be determined by the Court using the following standard:

> "... such value shall be determined in light of the purpose of the valuation and the proposed disposition of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." 11 U.S.C. § 506(a).

The proposed use of the property in this case is the continued use by the debtors for meeting household needs. The purpose of the valuation to be made by the Court herein is to allow or disallow all or a portion of the claim as a secured claim in this proceeding, and also to set, pursuant to the provisions of § 1325(a)(5)(B)(ii), the proper distribution to K–Beck under the terms of the proposed Chapter 13 plan of these debtors. The Chapter 13 plan contains a provision calling for the payment of secured claims "to the extent of value of their collateral as determined by Court (sic)."

Congress intended the concept of value to be a fluid one, not capable of a rigid application to all cases for all purposes.

> " 'Value' does not necessarily contemplate forced sale or liquidation value of the collateral; nor does it always imply a full going concern value. Courts will have to determine value on a case-by-case basis, taking into account the facts of each case and the competing interests in the case." House Report No. 95–595, 95th Cong., 1st Sess. (1977) 356, U.S.Code Cong. & Admin.News 1978, pp. 5787, 6312.

The question of valuation under § 506 has been resolved in the Chapter 13 setting by at least one court to mean the median between wholesale and retail value. *Ford Motor Credit v. Miller (In re Miller)*, 4 B.R. 392 (Bkrtcy.S.D.Cal.1980). This finding was made in respect to an automobile owned by the Chapter 13 debtors which they proposed to use during the course of the plan. The bankruptcy judge in that case was aided by use of a recognized authority on the value of used automobiles, the "Blue Book". No such aid is found in this case.

As pointed out in *In re Crockett*, 3 B.R. 365 (Bkrtcy.N.D.Ill.1980), however, even the existence of such a reliable independent guide to valuation as the "Blue Book" purports to be with respect to used cars, there are an infinite number of variables which make it difficult to rely on such values without further inquiry. In most cases it is difficult to imagine setting a reliable valuation without, for instance, some first hand testimony as to the condition of the collateral. Ordinarily, it might be expected that the debtor would, as owner of the property, give some opinion as to its present fair value. See Rule 701 of the Federal Rules of Evidence. Some additional evidence could normally be found in any sale documents, such documents reflecting the original price of the property and the date of sale. "Blue Book" guides may be appropriate in some cases and expert opinion, formed either by actual appraisal or experience in the industry, would normally be admissible on the § 506 valuation question.

It is important to remember the purpose of the present valuation. In the Chapter 13 context, most debtors are attempting to pay their creditors under a plan which strives to meet at least the minimum confirmation standards set forth in § 1325 of the Bankruptcy Code. Because the feasibility of most plans hinges on the retention of assets by the debtor (a car to enable the debtor to transport himself to work and furniture to enable him to satisfy basic living requirements, to cite two obvious examples), debtors will propose the treatment of creditors

326

who may hold a lien on these items consistent with § 1325(a)(5)(B)(i) & (ii) of the Bankruptcy Code. This means full payment of the present value of the secured claim, i. e. the value of the collateral, to the creditor holding such claim. This provision of the Code, referred to as "cram-down", is envisioned as fair in spite of any objection such creditor might raise because it affords such creditor the full benefit of its bargain as it existed at the time the Chapter 13 petition was filed. The holder of such a claim is entitled to no more than the full present value of its collateral and thus can be "crammed-down" over its objection if its treatment is consistent with § 1325(a)(5)(B).

It is relevant, then, to consider what a holder of a secured claim would realize on its secured claim if it were permitted to exercise fully its rights under the pre-existing security agreement. In the present case, K–Beck would be permitted to repossess the merchandise purchased at its store by the Damrons and cause its disposition in a commercially reasonable manner. Since K–Beck, and presumably all other retailers of similar merchandise, were willing to only pay wholesale value for such merchandise even in brand new condition, there can be no doubt that such merchandise, after being used for several months, would be valued at a figure somewhat below its new wholesale value. The standard of what could be obtained upon a commercially reasonable sale was considered the appropriate standard by the bankruptcy court in *Virginia National Bank v. Jones (In re Jones)*, 5 B.R. 736, 6 B.C.D. 965 (Bkrtcy.E.D.Va.1980). This standard represents a middle ground between distressed sale valuation and retail valuation. While it may not always be as precise a standard as, for instance, the rigid formula standard set out in *General Motors Acceptance Corporation v. Willis (In re Willis)*, 6 B.R. 555 (Bkrtcy.N.D.Ill. Oct. 9, 1980, Merrick, B. J.) (unreported), such standard, in the Chapter 13 context, will permit the Court the necessary flexibility to conform the valuation set with the reality of each case, that is, the actual age, condition and nature of the collateral in question.

It is upon this reasoning that the Court considers less than credible K-Beck's evidence that the merchandise is presently worth more than its new wholesale value. Using K Beck's figures, the merchandise purchased by the Damrons cost K–Beck approximately $2650. This cost reflects only actual cash payment to the manufacturer (or distributor as the case may be) and not the added costs of delivery, overhead and profit margin which would all be recoverable out of a retail sale of such merchandise in the ordinary course of the business of K Beck. Any commercially reasonable disposition of the property in this case would have to take into account such costs of sale. It is not reasonable to assume, therefore, that the application of a mere depreciation schedule would result in a valuation that would be appropriate. On the other hand, it is also not credible to assume that merchandise, thought by the Damrons to be worth $4800 some ten months ago, would be worth only $600 in "like new" condition today.

Recognizing that variables affecting valuation will exist in every case, the Court finds that in the Chapter 13 context the proper valuation standard to be applied is the standard of commercial reasonableness, a standard which will ordinarily result in a valuation somewhere between distressed sale valuation and retail valuation. In the context of the present case, given the age, condition and nature of the collateral, and given the various other factors of record, the Court hereby determines that the claim of K- Beck should be allowed as a secured claim to the extent of $2000.

IT IS SO ORDERED.