### In re Stephen R. DUNBAR, Donna W. Dunbar, Debtors.

### Bankruptcy No. 98–34623.

United States Bankruptcy Court,
E.D. Tennessee.

April 16, 1999.

F.D. Gibson, III, Maryville, TN, for Debtors.

Walter N. Winchester, Winchester, Sellers, Foster & Steele, P.C., Knoxville, TN, for Arcadia Financial, Ltd.

Michael H. Fitzpatrick, Knoxville, TN, trustee.

### MEMORANDUM ON DEBTORS' MOTIONS FOR REDEMPTION

RICHARD S. STAIR, Jr., Chief Judge.

This matter is before the court on two Motions for Redemption filed by the Debtors, Stephen R. Dunbar and Donna W. Dunbar, on January 19, 1999, by which the Debtors seek to redeem a 1996 Dodge and a 1995 Plymouth from liens held by Arcadia Financial, Ltd. (Arcadia). As required by E.D. Tenn. LBR 6008–1, a Declaration of Value accompanied each motion. On January 28, 1999, Arcadia filed a Response to Motions to Redeem. The sole issue before the court is whether the Debtors are proposing to pay Arcadia the amount of its secured claims as required by 11 U.S.C.A. § 722 (West 1993). This matter will be decided on the parties' Stipulations filed on March 26, 1999, and on briefs.

This is a core proceeding. 28 U.S.C.A. § 157(b)(2)(O) (West 1993).

### I

The Debtors filed their petition under Chapter 7 on October 19, 1998. They now wish to redeem two vehicles, a 1995 Plymouth, VIN 1P3AA46K6SF571087, and a 1996 Dodge, VIN 2B3HD46T2TH265679. Arcadia holds a lien against the Plymouth to secure a claim against the Debtors of $10,910.20. Similarly, Arcadia holds a lien against the Dodge to secure another claim against the Debtors of $18,935.76.

The parties agree that the "liquidation/foreclosure value" of the Plymouth is $5,600.00 and that its replacement value is $7,000.00. They likewise agree that the "liquidation/foreclosure value" of the Dodge is $9,400.00 and that the replacement value is $11,000.00. The Debtors argue that § 722 requires them to pay the "liquidation/foreclosure" value of the collateral, while Arcadia contends that the Debtors must pay the replacement value of the collateral.

### II

In the Stipulation, the parties agree to a " liquidation/foreclosure" value and a replacement value for each vehicle. The replacement value of collateral is "what the debtor would have to pay for comparable property." *Associates Commercial Corp. v. Rash*, —— U.S. ——, ——, 117 S.Ct. 1879, 1882, 138 L.Ed.2d 148 (1997). The "liquidation/foreclosure" terminology is awkward at best in light of decisions that distinguish between liquidation and fore-

closure values. Foreclosure value is "what the secured creditor could obtain through foreclosure sale of the property." *Id.* It has also been defined as the amount that the secured creditor would receive if it repossessed the collateral and sold it "in the most beneficial manner it could." *See In re Donley,* 217 B.R. 1004, 1007 (Bankr. S.D.Ohio 1998). Liquidation value has been defined as the amount that a party would receive if compelled to sell the property, *see In re Sumerell,* 194 B.R. 818, 825–27 (Bankr.E.D.Tenn.1996), and in more colorful terms, as the amount that a party would receive at a "fire sale." *See In re Penick,* 170 B.R. 914, 917–18 (Bankr. W.D.Mich.1994).

In their Debtors' Memorandum in Support of Redemption filed March 23, 1999, the Debtors argue that the liquidation value standard is the correct standard, but their analysis and the cases which they cite discuss the foreclosure value standard. The purpose of the Stipulations on this point is to assign a dollar figure for the valuation standards which each party contends is applicable. The Debtors argue in substance for the application of the foreclosure value standard in the redemption context, despite the fact that they have mislabeled it in their Debtors' Memorandum in Support of Redemption. Accordingly, the court will treat the stipulated "liquidation/foreclosure" value as the foreclosure value for the purposes of this Memorandum.

### III

Bankruptcy Code § 722 allows a debtor to redeem certain collateral from a lien "by paying the holder of such lien the amount of the allowed secured claim of such holder that is secured by such lien." 11 U.S.C.A. § 722. The phrase "allowed secured claim" is defined by § 506(a) as follows:

> (a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C.A. § 506 (West 1993).

### IV

■ Arcadia argues that valuation in the redemption context is controlled by the Supreme Court's decision in *Rash.* The issue before the Court in *Rash* was how to value a secured creditor's interest under § 506(a) when a debtor exercises the "cram down" option under § 1325(a)(5)(B). *See Rash,* 117 S.Ct. at 1882. The Fifth Circuit had held that the foreclosure value standard was mandated in a "cram down" by the first sentence of § 506(a), reasoning that the sentence set the value of collateral at the amount that the creditor would realize after selling the estate's interest in the collateral according to its security agreement. *See id.* at 1884.

That interpretation was rejected by the Court, which explained that the first sentence of § 506(a) directs courts to bifurcate claims into secured and unsecured components based on the value of the collateral. *See id.* The second sentence of § 506(a) instructs courts as to how to make that valuation. *See id.* at 1885. Specifically, a court must determine the value of the collateral " 'in light of the purpose of the valuation and of the proposed disposition or use of such property.' " *Id.* (quoting 11 U.S.C.A. § 506(a)). Accordingly, the Court looked to the purpose of the valuation and the proposed use of the property. The debtors had wanted to retain and use the collateral, a truck,

and make payments to the secured creditor as required by § 1325(a)(5)(B). *See id.* The Court explained that in the "cram down" situation, the creditor "is exposed to double risks: The debtor may again default and the property may deteriorate from extended use." *Id.* Subsection § 506(a) directed the Court to select a valuation that "accurately gauges" that situation, and the Court chose the replacement value standard. *See id.* That standard sets the value at the price that "the debtor would have to pay for comparable property." *Id.* at 1882.

Arcadia argues that the replacement value standard should also be used in the context of redemption because the Debtors would keep the property, just as the debtors had in *Rash.* It contends that the significant difference between redemption and a "cram down" is that a redemption can not be paid over time. Even that difference, it argues, would evaporate for Chapter 13 debtors who pay the secured creditor in a lump sum, assuming that they had the ability and desire to do so. The Debtors disagree, pointing to recent cases which reject Arcadia's position.

## V

The issue now before the court was decided by an Ohio Bankruptcy Court in *Donley.* In that case, the court acknowledged that *Rash* would appear to direct the use of the replacement value standard in redemption cases because the debtors retain and presumably use the collateral in both redemption and "cram down" situations. *See Donley,* 217 B.R. at 1006. The court explained that "[t]here are reasons, however, to believe that application of the replacement value standard does not reflect the 'purpose of the valuation and the proposed disposition or use of such property' in the context of redemption under chapter 7." *Id.* at 1006–07.

First, the court cited the legislative history to § 722 to distinguish redemption from "cram down." It cited a House report, which explained that "redemption ... 'amounts to a right of first refusal on a foreclosure sale of the property involved. It allows the debtor to retain his necessary property and avoid high replacement costs, and does not prevent the creditor from obtaining what he is entitled to under the terms of his contract.'" *Id.* at 1007 (citation omitted). The court concluded that § 722 was intended to place secured creditors in the position equivalent to having repossessed and sold the collateral. *See id.*

The court also cited a pre-*Rash* decision, *General Motors Acceptance Corp. v. Bell (In re Bell),* 700 F.2d 1053, 1055 (6th Cir.1983). In *Bell,* the Sixth Circuit expressed, in dicta, the belief that redemption should be for the fair market value of the property, determined by the amount that the creditor would get in a sale for the benefit of the creditor. *See Donley,* 217 B.R. at 1007 (citing *Bell,* 700 F.2d at 1055). That standard was adopted by several bankruptcy courts prior to *Rash. See Penick,* 170 B.R. at 917–18 (rejecting the liquidation standard and citing decisions adopting the standard which set the value of collateral as the fair market value of the property "yielded by a commercially reasonable disposition of the property"); *see also Sumerell,* 194 B.R. at 824–27 (in the context of § 522(a)(2), rejecting the liquidation value standard in favor of the fair market value standard, describing it as the price paid by a willing buyer to a willing seller, both under no compulsion to enter the transaction and collecting decisions holding the same).

*Rash,* the court determined, did not require a change from the understanding of redemption and valuation that is exhibited in the legislative history in § 722 and in *Bell. See id.* Reaching that conclusion would ignore the Court's analysis in *Rash,* where it highlighted that a secured creditor in a "cram down" is exposed to the double risk of default and depreciation. *See Donley,* 217 B.R. at 1007. Neither risk exists in redemption where the secured creditor receives a lump sum pay-

ment and the collateral is released from the creditor's lien. *See id.*

The *Donley* court concluded that the replacement value standard was not appropriate for redemption cases and applied the foreclosure value standard requiring the debtor to pay the secured creditor the amount that it would receive if it repossessed the collateral and sold it "in the most beneficial manner it could." *Id.*

Arcadia asks this court to do exactly what *Rash* directs it not to do, that is, apply a standard of valuation without regard to the purpose that the valuation will serve and the use that the collateral will meet. *Donley* respects both the decision and the analysis of the Supreme Court in *Rash,* and applies it thoughtfully in a different context. Other courts have recognized as much. *See In re Williams,* 228 B.R. 910 (Bankr.N.D.Ill.1999) and *In re Williams,* 224 B.R. 873 (Bankr.S.D.Ohio 1998).

## VI

The foreclosure value standard is appropriate for determining the amount that a Debtor must pay in order to redeem collateral under § 722. Thus, in order to redeem the vehicles, the Debtors must pay Arcadia $5,600.00 for the Plymouth and $9,400.00 for the Dodge.

An order consistent with this Memorandum will be entered.