**In re Steven ARD, Carla Ard, Debtors.**

No. 01–15967.

United States Bankruptcy Court,
S.D. Alabama.

March 21, 2002.

James M. Orr, Jr., Mobile, AL, for Debtors.

Leonard Math and Daniel Feinstein, Montgomery, AL, for Army Aviation Center Federal Credit Union.

## ORDER GRANTING DEBTORS' MOTION TO REDEEM AND MOOTING ARMY AVIATION CENTER FEDERAL CREDIT UNION'S MOTION FOR RELIEF FROM STAY

MARGARET A. MAHONEY, Chief Judge.

This matter is before the Court on Army Aviation Center Federal Credit Union's (AACFCU) motion for relief from stay and the debtors' motion to redeem. The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Order of Reference of the District Court. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and the Court has the authority to enter a final order. For the reasons indicated below, the Court is granting the debtors' motion to redeem and is mooting AACFCU's motion for relief from stay.

### FACTS AND PROCEDURAL HISTORY

The debtors, Steven and Carla Ard, filed this chapter 7 bankruptcy on November 21, 2001. On Schedule B, "Personal Property," debtors listed a 1995 Nissan Altima with 150,000 miles as having a current market value "without deducting any se-cured claim or exemption" of $2,500. The 1995 Altima was also listed on Schedule C, "Property Claimed as Exempt," as having 150,000 miles on it with a value of $2,500. The Altima was claimed as exempt for $1.00. AACFCU was listed on Schedule D, "Creditors Holding Secured Claims." Again, the debtors listed the 1995 Altima's fair market value as $2,500. AACFCU's claim was listed as $2,500 in the column entitled "amount of claim without deducting value of collateral." The debtors also show that the Altima was pledged as collateral for a 1998 car loan. The debtors' Statement of Intention states that the Altima debt to AACFCU will be reaffirmed.

AACFCU filed a motion for relief from stay on January 4, 2002. AACFCU's motion alleges that the amount due on the Altima debt is $2, 484.55 (principal) plus interest. Of course, AACFCU wishes to have the § 362 stay lifted so that it can repossess the vehicle. AACFCU states in its motion that AACFCU does not want to reaffirm the debt. In response to AACFCU's motion, the debtors filed a motion to redeem pursuant to 11 U.S.C. § 722 on January 28, 2002. In their motion, debtors allege that the Altima now has a value of $1,500. Debtors state that the amount of the debt to AACFCU is $2,484.55 plus interest.

A hearing was held on February 27, 2002 on AACFCU's motion and the debtors' motion. Debtor Carla Ard testified at the hearing. Her husband could not attend the hearing because he was called in to work. A representative from AACFCU, Kenneth Long, also testified. Several exhibits were introduced into evidence. The testimony and exhibits establish the following facts pertinent to the motions before the Court:

Debtor Steven Ard purchased the used four-cylinder 1995 Nissan Altima from

AACFCU on October 11, 2000. Mr. Ard paid $3,357.50 for the car, which had 125,768 miles on it. AACFCU has a properly perfected lien on the Altima, which is noted on the Alabama Certificate of Title, a copy of which was introduced into evidence as Debtor Exhibit 1. The car had several things wrong with it when it was purchased. The trip monitor was not working and the odometer was broken. These items are still broken today. In addition, the paint was not "any good." Since the purchase, the car has developed many other problems. It uses one quart of oil per week. The CV joints are "out." And, the transmission sometimes slips into overdrive.

Mr. Ard has owned the car for approximately 15 months. He works for CSX Railroad and currently works out of the New Orleans division. For the last six months, he has driven round-trip to New Orleans using this car five to six days per week. The debtors live in Saraland, just north of Mobile. It is approximately 310 miles round-trip from Mobile to New Orleans. Ms. Ard also drives the car regularly. In her opinion, the car is "pretty reliable" but it is now not worth any more than $1,500. The debtors have some experience buying and selling used cars, having bought and sold eight to ten cars in the last five years.

Mr. Kenneth Long appeared and testified as representative of AACFCU. Mr. Long is vice-president of collections of AACFCU. He is familiar with Mr. Ard's account and has seen the Altima. He is also familiar with the buying and selling of used cars, having previously been the used car manager of a Cadillac dealership in Dothan, Alabama for 15 years.

AACFCU Exhibit 1 put into evidence is a copy of the front page of the November 2001 N.A.D.A. "Official Used Car Guide," "Southeastern Edition," as well as pertinent pages from the book (to be exact, pages 68–69, 72–73 and the High Mileage Table). Using the N.A.D.A. book as a guide to value, Mr. Long testified that the retail value of the 1995 Nissan Altima is $6,125 without any deductions for high mileage, etc. The N.A.D.A. book contains figures for cars in average condition. He believes that N.A.D.A. retail is a reliable measure of value in this situation. After deducting $2,325 for the high mileage (the car is considered a class II vehicle on the high mileage chart because it has 150,000 miles), the vehicle is worth, in Mr. Long's opinion, $3,800 using the N.A.D.A. retail value as the starting point ($6,125 minus $2,325).[1] If the Altima were for sale on a used car lot, he believes it would be listed for $3,995. The wholesale value of the vehicle is $2,500, which is what he believes it would bring if auctioned wholesale. He also believes that the car would bring more at auction this time of the year. When the car was purchased by Mr. Ard, Mr. Long thinks it would have appraised in the N.A.D.A. book at $5,200.

## ISSUE

The debtors argue that $1,500 is a fair value for the Altima and they have offered to redeem the car for $1,500. Debtors' counsel contends that since the total sale price was $3,357.50, it would not be appropriate to force the debtors to redeem using AACFCU's claimed retail value; otherwise, debtors would pay more now to redeem than they did when Mr. Ard purchased the car in October 2000.

1. N.A.D.A. "Loan Value" is $4,150 and N.A.D.A. "Trade–In" is $4,600. These figures do not include any high mileage deduction.

AACFCU argues, on the other hand, that retail value is the appropriate standard to use for redemption purposes. AACFCU contends that although the Altima is used, the evidence shows that it is very reliable. Accordingly, AACFCU believes that debtors should have to pay $3,995 to redeem.

■ The issue, then, is: What is the appropriate standard of value to use as the starting point for collateral valuation in a chapter 7 bankruptcy for purposes of a motion to redeem? The debtors bear the burden of proving the appropriate redemption value by a preponderance of the evidence. See, e.g., *In re Brown*, 244 B.R. 603, 610–11 (Bankr.W.D.Va.2000) (court noting that where "creditor's rights are being reduced or eliminated it seems appropriate that the burden of proof in such a situation should be placed upon the party benefitting from the process, i.e., the debtor.").

### LAW [2]

■ 11 U.S.C. § 722 is the applicable starting point on a motion to redeem. This Code section states as follows:

An individual debtor may, whether or not the debtor has waived the right to redeem under this section, redeem tangible personal property intended primarily for personal, family, or household use, from a lien securing a dischargeable consumer debt, if such property is exempted under section 522 of this title or has been abandoned under section 554 of this title, by paying the holder of such lien the amount of the allowed secured claim of such holder that is secured by such lien.

■ 11 U.S.C. § 722 (emphasis added). The evidence is undisputed that the 1995 Altima loan is a dischargeable consumer debt, that the Altima vehicle is "tangible personal property intended primarily for personal, family, or household use," and that AACFCU has a properly perfected security interest in the Altima. Thus, the question becomes what is "the amount of" AACFCU's "allowed secured claim," for that is the amount which § 722 requires the Ards to pay in order to redeem the vehicle and obtain release of AACFCU's lien.[3]

**2.** On their Statement of Intention, debtors state that they intend to reaffirm the debt with AACFCU. The Eleventh Circuit has recognized that "[t]he plain language of section 521(2)(B), which requires a debtor, within forty-five days of the filing of the statement of intention, to 'perform his intention with respect to such property ...,' indicates that the debtor must perform some act with respect to the property within a specified period of time." *Taylor v. AGE Federal Credit Union (In re Taylor)*, 3 F.3d 1512, 1516 (11th Cir. 1993). Debtors' Statement of Intention was filed with the petition on November 21, 2001. Debtors did not reaffirm the debt within forty-five days and now want to redeem. The motion to redeem was filed January 28, 2002. The question then is: Can the debtors redeem even though they did not perform their stated intention of reaffirming the debt with AACFCU within 45 days of November 21? There is authority which holds that "[t]he notice and time limitations provisions of sec-

tion 521(2) do not abrogate the debtors' substantive right to redeem the household goods under section 722 of the Code." *In re Eagle*, 51 B.R. 959, 963 (Bankr.N.D.Ohio 1985); see also *In re Rodgers*, 273 B.R. 186, 191 (Bankr. C.D.Ill.2002) (following In re Eagle and holding same). In addition, AACFCU has not raised this issue as an alleged bar to redemption. Consequently, the Court finds that debtors' failure to reaffirm or redeem within the 45–day period of § 521(2) is not a bar to redemption in this case.

**3.** Note that where the balance due on the creditor's claim is less than the value, then redemption is for the balance due. *In re Williams*, 224 B.R. 873, 876 (Bankr.S.D.Ohio 1998). Stated differently, the redemption price is "the lesser of the unpaid balance of the claim or the value of the collateral." *Sears, Roebuck & Co. v. Spivey*, 265 B.R. 357, 363 (E.D.N.Y.2001).

Section 722 does not define what is an "allowed secured claim." *Id.* 11 U.S.C. § 506(a) of the Bankruptcy Code entitled "Determination of Secured Status," however, defines an allowed secured claim as follows:

An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C. § 506(a).

In *Associates Commercial Corp. v. Rash,* 520 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997), the United States Supreme Court held that § 506(a) "directs application of the replacement-value standard" and not a " foreclosure value" standard when a debtor exercises a "cramdown" against a secured creditor under 11 U.S.C. § 1325(a)(5)(B). *Rash,* 520 U.S. at 955–56, 117 S.Ct. at 1882.[4] Rash was a chapter 13 case. *Rash,* 520 U.S. at 956, 117 S.Ct. at 1882–83. After Rash, several creditors across the country have frequently taken the position that the Rash "replacement value" standard should apply in a chapter 7 case for purposes of valuing collateral on a motion to redeem. See, e.g., *Sears, Roebuck & Co. v. Spivey,* 265 B.R. 357, 363 n. 5 (E.D.N.Y.2001) (court noting that in redemption context, "[s]ome creditors argue that the value [i.e., of collateral] is represented by the replacement valuation developed by *Associates Commercial Corp. v. Rash,* 520 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997).").

The Court has been unable to locate any reported decision which applies the Rash "replacement value" standard to assess the value of collateral that is the subject of a chapter 7 motion to redeem. As one court has correctly recognized, "there appear to be no reported decisions adopting replacement cost for valuing secured claims in the context of redemption, while numerous decisions have adopted the liquidation standard." *In re Tripplett,* 256 B.R. 594, 598 (Bankr.N.D.Ill.2000) (citations omitted). The reported post-Rash decisions which have addressed this issue unanimously reject the Rash approach in a chapter 7 and hold that in a chapter 7 redemption motion, the starting point for collateral valuation is "liquidation," "foreclosure," or "wholesale" value. *In re Williams,* 224 B.R. 873, 876 (Bankr.S.D.Ohio 1998); *In re Dunbar,* 234 B.R. 895, 899 (Bankr. E.D.Tenn.1999); *In re Henderson,* 235 B.R. 425, 428 (Bankr.C.D.Ill.1999); *In re Russell,* 2000 WL 33673802, *2 (Bankr. M.D.N.C.2000); *In re Weathington,* 254 B.R. 895, 899 (6th Cir. BAP 2000); *In re Tripplett,* 256 B.R. 594, 597–98 (Bankr. N.D.Ill.2000); *In re Ballard,* 258 B.R. 707, 709 (Bankr.W.D.Tenn.2001); *In re Donley,* 217 B.R. 1004, 1007 (Bankr.S.D.Ohio 1998); see also *In re Williams,* 228 B.R. 910, 913 n. 4 (Bankr.N.D.Ill.1999); *Sears, Roebuck*

---

**4.** Many creditors assume that "replacement value" is always equal to retail value. This assumption is erroneous; the Rash opinion clearly does not say that. *Rash,* 520 U.S. 953 n. 6, 117 S.Ct. at 1886 n. 6 ("Whether re-placement value is the equivalent of retail value, wholesale value, or some other value will depend on the type of debtor and the nature of the property.").

*& Co. v. Spivey,* 265 B.R. 357, 363 n. 5 (E.D.N.Y.2001) (recognizing that most courts hold that redemption price is liquidation value).

The primary reason for rejection of *Rash* in the chapter 7 redemption context is that a secured creditor in a chapter 7 redemption—in contrast to a secured creditor being "crammed down" in a chapter 13 plan confirmation—is not exposed to the risks of further default and depreciation of its collateral. See, e.g., *In re Dunbar,* 234 B.R. at 898–99; *In re Henderson,* 235 B.R. at 428. The logic of this reasoning is hard to ignore. Why? Because in a chapter 7 redemption, the secured creditor "receives a lump sum payment and the collateral is released from the creditor's lien." *Dunbar,* 234 B.R. at 898–99.[5]

■ The Court has carefully studied *Rash* and the above post-*Rash* authorities which have rejected *Rash* in the chapter 7 redemption context. The logic and reasoning employed in these cases are very compelling. Thus, the Court follows the foregoing authorities and holds that the *Rash* " replacement value" is not the appropriate measure of collateral value to apply in a chapter 7 redemption. The Court joins the growing number of post-*Rash* authorities and holds that the appropriate starting point for valuing collateral in a chapter 7 redemption proceeding is liquidation/foreclosure value. Liqui-

dation/foreclosure value is defined as the amount that the secured creditor "would receive if it repossessed the collateral and sold it 'in the most beneficial manner it could.'" *Dunbar,* 234 B.R. at 899 (quoting *In re Donley,* 217 B.R. at 1007).[6]

■ Using liquidation value as the starting point, the Court may, of course, consider other evidence pertinent to value such as the debtor's testimony as to the vehicle's condition, high mileage, etc. in determining whether a reduction in value in a particular case is appropriate. See, e.g., *Henderson,* 235 B.R. at 429.

■ The evidence reflects that the wholesale value of the vehicle is $2, 500. AACFCU's representative testified that in his opinion the vehicle would bring $2,500 if auctioned wholesale. Consequently, the Court finds that in this case $2,500 is the starting point of value.

Debtor Carla Ard testified that the vehicle has a broken odometer and trip meter. These items have been broken since the car was purchased and are still broken today. Undoubtedly, a broken odometer would greatly reduce what the car might bring if repossessed and sold by a creditor "in the most beneficial manner" assuming, of course, that the broken odometer was disclosed to the wholesale purchaser.

---

5. There is another compelling reason why a *Rash* replacement value approach is not appropriate in this case. Under AACFCU's view, debtors should pay a retail value of $ 3,995 to redeem. If this standard of value was adopted, debtors would actually pay more to redeem the vehicle now than they paid 15 months ago for the vehicle (recall that Mr. Ard paid $3,357.50 for the Altima in October 2000), and debtors would pay more than the unpaid principal balance owed to AACFCU. Nothing in § 722 or any other provision of the Bankruptcy Code condones or contemplates such a result.

6. "Liquidation," "wholesale," and "foreclosure" values are terms used interchangeably here. Some courts have recognized a distinction in these terms. *Dunbar,* 234 B.R. at 896–97; *Weathington,* 254 B.R. at 899 n. 1. This Court follows the *Weathington* court in noting that "[f]or our purposes, both terms refer to the secured creditor's expected recovery upon repossession and sale by auction or other wholesale means." *Weathington,* 254 B.R. at 899.

Although Ms. Ard said the car was "pretty reliable," the car has several other mechanical problems which would also adversely impact what the car would bring at wholesale auction. It uses one quart of oil per week. This is not normal. It is obvious that there is a major repair needed. And, the CV joints are out, and sometimes the transmission "slips" into overdrive. The vehicle now has approximately 150,000 miles on it. Moreover, the car had at least 125,768 miles on it when Mr. Ard bought it. Ms. Ard's testimony concerning the mileage and problems with the vehicle was undisputed. Ms. Ard believes the car is now worth $1,500.

Given the Altima's high mileage and Ms. Ard's testimony concerning its condition, the Court concludes that a $1,000 reduction in value is appropriate so that the debtors may redeem the car for $1,500.

For the foregoing reasons, IT IS ORDERED:

1. Debtors' motion to redeem is GRANTED. Debtors have thirty (30) days from the date of this Order to tender $1,500 to AACFCU in order to redeem the Altima vehicle. Upon receipt of the $1,500, AACFCU shall promptly take all steps necessary to effectuate release of its lien on the vehicle.

2. Since this matter was taken under advisement, the discharge was entered. Consequently, AACFCU's motion for relief from stay is MOOT.